1  CENTER FOR DISABILITY ACCESS
   Mark Potter, Esq., SBN 166317
2  Phyl Grace, Esq. SBN 171771
   Mail: PO Box 262490
3        San Diego, CA 92196-2490
   Delivery: 9845 Erma Road, Suite 300
4        San Diego, CA 92131
   (858) 375-7385; (888) 422-5191 fax
5  Phylg @ potterhandy.com
        Attorneys for Plaintiff

6

7

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

11  **Arthur Gray**,                  | **Case:** 1:14-CV-00204-LJO- JLT

12        Plaintiff,              | **Plaintiff's Memorandum of Points and Authorities in Support of His Motion for Summary Judgment**

13     v.

14  **County of Kern**,            | Date:    October 6, 2015
                                     Time:    8:30 am
15        Defendant.               | Ctrm:    4 (7th floor)

16

17                                   Hon. Judge Lawrence J. O'Neill

18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ............................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

I.   PRELIMINARY STATEMENT ................................................................ 1

II.  RELEVANT FACTS ................................................................................ 1

III.  LEGAL STANDARD ............................................................................... 8

IV.  AMERICANS WITH DISABILITIES ACT VIOLATIONS ...................... 8

  A.  Plaintiff is Disabled ........................................................................ 10

  B.  Defendant is a Public Entity ............................................................ 10

  C.  KMC Had Discriminatory Barriers Which Plaintiff Encountered ....... 10

V.  VIOLATION OF THE CALIFORNIA DISABLED PERSONS ACT ("CDPA") ................................................................................................ 17

VI.  REMEDIES ........................................................................................... 18

VII.  CONCLUSION ..................................................................................... 18

Plaintiff's Motion for Summary Judgment       Case: 1:14-CV-00204-LJO- JLT

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1067 (9th Cir. 2010) ................10

*Celotex Corp. v. Catrett*

    477 U.S. 317 (1986) ........................................ 8

*Chapman v. Pier 1 Imports (U.S.) Inc.* 631 F.3d 939 (9th Cir. 2011) ...... 9, 11, 12

*Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944-45 (9th Cir. 2011.....9

*Cullen v. Netflix, Inc.*,

    880 F.Supp.2d 1017 (N.D. Cal. 2012) ...........................17

*Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) .................. 9

*Rush v. Denco Enterprises, Inc.*,

    857 F. Supp. 2d 969 (C.D. Cal. 2012) ...........................11

Title 28, Part 35 of the Code of Federal Regulations............................ 8

**Statutes**

42 U.S.C. § 12102(2)(A).......................................10

42 U.S.C.A. § 12131(B)........................................10

Civ. Code § 51 (f) ...............................................17

**Other Authorities**

28 C.F.R. § 36.304(b) ..........................................9

28 C.F.R., Part 36, Appendix D

    ("ADAAG") § 4.27 ..........................................7

Department of Justice, Technical Assistance Manual on the American

    with

     Disabilities Act (BNA) §§ III-4.4100 (1991)..........................6

Plaintiff's Motion for Summary Judgment       Case: 1:14-CV-00204-LJO- JLT

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   PRELIMINARY STATEMENT

This is a case brought by plaintiff, alleging that defendants discriminate against persons with disabilities by failing to provide accessible restrooms in patient rooms, and in public areas, failing to provide accessible slopes and cross slopes in the entrance and exit area of the Medical Center building, failing to provide accessible sinks in the neo-natal unit that do not require foot pedals to operate, and failing to provide accessible drinking fountains.

These dangerous conditions and barriers, of which Plaintiff has actual knowledge and experience, have caused him significant difficulty, frustration and inconvenience. Plaintiff has been deterred from visiting the Medical Center over the last 2 years, for both his own medical treatment and to visit hospitalized loved ones, because of the existence of these dangerous conditions and barriers.

Plaintiff seeks only a ruling that his rights were violated under the Americans with Disabilities Act and the California Disabled Persons Act. Plaintiff will reserve the question of relief sought for trial.

## II.   RELEVANT FACTS

Plaintiff Arthur Gray is a paraplegic. He cannot stand or walk and has significant manual dexterity impairments. (SUF #1). Mr. Gray is and at all times relevant herein was, a "qualified person with a disability" and a "physically disabled person" as those terms are defined under the ADA and its implementing regulations. (SUF #2). He uses a wheelchair for mobility. (SUF #3).

1

Defendant County of Kern ("County") is, and at all times relevant to herein was, a public entity within the meaning of Title II of the ADA. (SUF #4). The County owned, operated, controlled, maintained and exercised dominion over the medical facilities known as the Kern Medical Center ("KMC") located in or about 1700 Mount Vernon Avenue in the City of Bakersfield, County of Kern, California. (SUF #5). KMC is a 222 bed acute care teaching hospital. (SUF #6). At all times relevant to this action, Defendants were a "public entity" within the meaning of Title II of the ADA, and the public facilities at KMC are a program, service and/or activity Defendants offer to the general public. (SUF #7). KMC has undergone construction and/or alterations since January 26, 1992. (SUF #8).

Mr. Gray has been a patient at KMC for decades. He have visited the Medical Center countless times to obtain emergency room services, primary care, orthopedic care, surgery, x-rays and other medical services, including at least a dozen visits within the statutory period. (SUF #9). Additionally, Mr. Gray needs to go to the Medical Center to service the computerized equipment in his abdomen when it malfunctions. (SUF #10).

Mr. Gray visited KMC numerous times in September 2011 when his grandson was admitted shortly after birth. Mr. Gray's grandson stayed in the Neo-natal Intensive Care Unit ("NICU") for several days. (SUF #11). Additionally, on October 3, 2011 Mr. Gray broke his femur and was admitted to KMC. He had surgery and stayed in the hospital in a patient room for several days. (SUF #12).

Between the end of 2011 through 2013, Mr. Gray visited multiple areas of KMC on numerous occasions, both as a patient and as a visitor.

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

These visits included follow-up doctor visits for his femur surgery as a patient, emergency room visits as a patient, and visits to friends and family who were admitted patients. (SUF #13). Between October 2011 and August 2014, Mr. Gray was deterred from visiting KMC on approximately fifty (50) occasions due in part to the conditions described below. (SUF #14). Approximately twenty (20) of those visits were times Mr. Gray requested the ambulance he had called divert away from KMC. (SUF #15).

While admitted as a patient, Mr. Gray encountered inaccessible conditions in the patient rooms. (SUF #16). The inaccessible conditions Mr. Gray encountered included: (1) a 6" strike side clearance at the bedroom door to the corridor due to the sink location; (2) The sink has foot-operated controls and lacks a 27" high space 8" in from the front of the sink; (3) The bottom of the reflective surface of the mirror is 49" above the floor; (4) The toilet room is only 43" wide and the door is 30" wide; and (5) There are no grab bars on the side or rear wall. (SUF #17).

Mr. Gray could not clean himself in the bathroom inside the patient room because of the lack of clearance space for his wheelchair. (SUF #18). He was embarrassed to catheterize himself on the bed as it lacked the privacy of a restroom, and he feared he would contract a urinary tract infection because he could not enter the bathroom to empty his urine bag. (SUF #19). Mr. Gray was forced to go the bathroom in the hallway to clean up. (SUF #20). These conditions caused Mr. Gray difficulty, discomfort, embarrassment, and frustration. (SUF #21).

While visiting KMC, Mr. Gray has encountered inaccessible conditions at numerous public restrooms. (SUF #22). The inaccessible conditions Mr. Gray encountered in the East Lobby Men's Restroom

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

included: (1) There is only 1 urinal in the men's restroom and the rim is 24" above the floor; (2) The centerline of the toilet is 20" from the adjacent wall; (3) The seat cover dispenser is 55" above the floor and located behind the toilet; and (4) The bottom of the reflective surface of the mirror is 41" above the floor. (SUF #23).

The inaccessible conditions Mr. Gray encountered in the West Lobby Men's Restroom included: (1) There is only 1 urinal in the men's restroom and the rim is 19-1/2" above the floor; (2) The accessible toilet seat height is 16" above the floor; (3) The "accessible" toilet compartment is only 38" wide; and (4) The floor cross slope at the accessible lavatory is 4.6%.(SUF #24).

The inaccessible conditions Mr. Gray encountered in the South Lobby Men's Restroom included: (1) The restroom is not accessible at all as the door is only 27" wide; (2) The toilet compartment is 36" wide and there are no grab bars; (3) The urinal rim is 24" above the floor; and (4) There is no 60" diameter turnaround within the room. (SUF #25).

The inaccessible conditions Mr. Gray encountered in the 2nd Floor Surgery Clinic West Unisex Restroom included: (1) There is no rear grab bar at the toilet; (2) The drain and hot water pipes below the lavatory are not insulated to prevent wheelchair users from burning their legs; (3) The lavatory faucets are knob-type that require grasping; (4) The seat cover dispenser is 55" above the floor and located behind the toilet; (5) The bottom of the reflective surface of the mirror is 49" above the floor; (6) The "accessible" toilet compartment is only 41" wide; and (7) The room size does not permit a 60" diameter clear floor space to allow a wheelchair user to enter the room, turn around and exit in the opposite direction. (SUF #26).

4

These conditions caused Mr. Gray difficulty, discomfort, embarrassment, and frustration. (SUF #27). The conditions put him at risk for dangerous infections and forced him to travel great distances to the few useable restrooms in the expansive facility. (SUF #28).

While visiting KMC, Mr. Gray has encountered excessive slopes and cross slopes on the ramps leading into and out of KMC, as well as on exterior paths. (SUF #29). The inaccessible conditions Mr. Gray encountered included: (1) The exterior ramp from the West parking lot to the West main appointment Lobby has a 9.6% running slope; (2) An adjacent ramp that leads to the Patient Financial Office has a 9.0% running slope; (3) The handrail adjacent to the building wall is not rounded or returned to the wall; (4) The ramp leading down to the Emergency Room has a 5.5% slope but lacks handrails; (5) The ramp to OB/GYN has a 9.1% slope, the handrails are 32" above the ramp surface and are not rounded or returned to a wall and there is no curb or wheel guide at the sides of the ramp to prevent a wheelchair's wheels from going off the edge of the ramp; (6) There is a curb ramp that is located along a concrete walk that leads North from the West Parking Lot accessible parking to the Bungalows that has a bottom landing with a cross slope of 10.8%; (7) This same concrete walk has a cross slope of 2.7%; and (8) The curb ramp leading to the Emergency Room has a 10.4% slope and the counter slope at the bottom of the curb ramp is 10.2%. (SUF #30).

Mr. Gray has been forced to seek assistance from pedestrians to push him up to the doorway of KMC. (SUF #31). These conditions caused Mr. Gray difficulty, discomfort, embarrassment, and frustration. (SUF #32).

5

While visiting his grandson in the NICU at KMC, Mr. Gray encountered sinks that are only operable using foot pedals. (SUF #33). The inaccessible conditions Mr. Gray encountered included: (1) There is 0" strike side clearance at the door into NICU; (2) The sink has foot-operated controls and lacks a 27" high space 8" in from the front of the sink; and (3) The sink drain and hot water pipes in NICU are not wrapped or insulated. (SUF #34).

Mr. Gray was forced to lean on the left of his wheelchair, and maneuver the right front wheel of the wheelchair onto the pedal. However, when Mr. Gray reached out to use the sink, his wheelchair spun off the pedal and he jerked my back badly because of this. Mr. Gray suffered severe back pain on the days that followed. (SUF #35).

While visiting KMC, Mr. Gray encountered drinking fountains that are inaccessible and too high to access in his wheelchair. (SUF #36). The drinking fountain adjacent to the East Lobby elevator on the 1st floor does not accommodate wheelchair users as the spout height is 38-1/2" above the floor. (SUF #37). The drinking fountain adjacent to the West Lobby elevator on the 1st floor does not accommodate wheelchair users as the spout height is 40" above the floor. Additionally, this drinking fountain lacks any knee clearance below to allow a wheelchair user to make a front approach. (SUF #38).

Mr. Gray has been forced to make a cone out of a piece of paper to be able to drink water. These conditions caused Mr. Gray difficulty, discomfort, embarrassment, and frustration. (SUF #39).

Defendant has no record of a Transition Plan, nor does it have a record of having conducted a Self-Evaluation Plan prior to 2012. (SUF #40). On or about July 15, 2012 Defendant completed a "Physical

1  Accessibility Review Survey," apparently in lieu of the required Self
2  Evaluation Plan. (SUF #41). The survey was completed by several
3  unidentified individuals, and signed off by KMC Facility Manager Ronald
4  Eyraud. (SUF #42). Mr. Eyruad was identified as Defendant's person
5  most qualified to testify as the history of modifications made to the
6  Medical Center over the last five years; the wheelchair accessibility at the
7  Medical Center, specifically, the wheelchair accessibility at the restroom,
8  paths of travel to the Center, sinks in the neo-natal unit and drinking
9  fountains; any ADA Trained Professional that has examined the Medical
10  Center; and any foundational, non-privileged information, training,
11  education, work experience, facts, conversations, documents or personal
12  knowledge upon which the deponent bases his or her knowledge of the
13  noticed matters described above. (SUF #43).

14      Mr. Eyruad had never reviewed the entirety of the survey, did not
15  know who completed it, and has had no formal ADA accessibility
16  training. (SUF #44).  The survey itself did not contain any examination of
17  the patient rooms or slope of entrance and exit ramps, nor did it define
18  key terms such as "accessible toilet room." (SUF #45). Mr. Eyruad has
19  never designated any accessibility modifications an undue burden. (SUF
20  #46).

21      Because Mr. Gray is a regular patient at KMC, he will continue to
22  face the same discriminatory barriers. KMC is a convenient hospital to go
23  for Mr. Gray's recurring medical needs. It has been his primary medical
24  care center until recently. He has been deterred from seeking treatment
25  there because of the repeated barriers and obstacles he faced during his
26  visits. Once the barriers are removed, Mr. Gray will return and continue

27
28

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

1   to visit and access the various medical facilities at the Kern Medical
2   Center as and when the need arises. (SUF #47).

3

4                           III.   LEGAL STANDARD

5          Pursuant to section 56 of the Federal Rules of Civil Procedure, a
6   party can bring a motion for summary judgment where there is no
7   genuine dispute as to any material fact. Motions for summary judgment
8   are not "disfavored." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).
9   In the present case, there can be no genuine dispute over the facts of the
10  case and those facts inform the court and the parties that it would be a
11  waste of judicial resources for this case to proceed to trial. There is no
12  genuine issue of material fact and this court should grant the plaintiff's
13  motion.

14

15  **IV.   AMERICANS WITH DISABILITIES ACT VIOLATIONS**

16         Program accessibility requirements, relevant under Title II, which
17  govern this case, are found in Title 28, Part 35 of the Code of Federal
18  Regulations. Section 35.149 provides the general prohibition against
19  discrimination, which states that "no qualified individual with a disability
20  shall, because a public entity's facilities are inaccessible to or unusable for
21  individuals with disabilities, be excluded from participation in, or denied
22  the benefits of the services, programs, or activities of a public entity..."
23  Here, the County failed to provide programmatic access inside the
24  medical center that it owns and operates. These inaccessible conditions
25  are discriminatory and render this program inaccessible to wheelchair
26  users in violation of the ADA.

27

28

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

The term "discrimination" can be misleading. The ADA applies not just to intentional discrimination but to thoughtlessness and indifference:

> Its passage was premised on Congress's finding that discrimination against the disabled is most often the product, not of invidious animus, but rather of thoughtlessness and indifference, of benign neglect, and of apathetic attitudes rather than affirmative animus. The concept of "discrimination" under the ADA does not extend only to obviously exclusionary conduct—such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance. Rather, the ADA proscribes more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' "full and equal enjoyment" of places of public accommodation.

*Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944-45 (9th Cir. 2011) (internal quotes and citations removed for readability).

To establish a violation of Title II of the ADA, a plaintiff must show that "(1) he is a qualified individual with a disability; (2) he was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of his disability[1]." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (citing *Weinreich v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976, 978 (9th Cir. 1997).

As discussed below, Plaintiff's civil rights were violated because the defendant over and over failed to provide accessible conditions at KMC.

---

[1] While Plaintiff will need to show additional elements to be awarded damages and/or injunction under the ADA and/or CDPA, this showing is sufficient for the ruling he seeks with the present motion.

### A.  Plaintiff is Disabled

The Plaintiff is a man with severe mobility impairments who cannot walk and uses a wheelchair for mobility. There can be little doubt that he fits the qualification under the Americans with Disabilities Act as a person with a disability. 42 U.S.C. § 12102(2)(A) (defining a physical impairment substantially affecting a major life activity as qualifying as a disability). Given Plaintiff's inability to walk, and Defendant's admission that Plaintiff is an individual with a disability as defined by this statute, this is not a genuine issue.

### B.  Defendant is a Public Entity

Under 42 U.S.C.A. § 12131(B), a public entity is defined as " any department, agency, special purpose district, or other instrumentality of a State or States or local government." Given that Defendant admitted in its Answer that it is a public entity with the meaning of Title II of the ADA, this is not a genuine issue.

### C.  KMC Had Discriminatory Barriers Which Plaintiff Encountered

Title II does not include technical requirements for accessibility but instead refers to Title III, which included the 1991 Americans with Disabilities Act Accessibility Guidelines (ADAAG). "Congress intended that the protections of Title III be incorporated into Title II and that Title II be construed in a manner consistent with the regulations governing the RA and its identical protections." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1067 (9th Cir. 2010) (quoting legislative history to the effect that "The Committee intends, however, that the forms of discrimination prohibited by section 202 [Title II] be identical to those set out in the

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

applicable provisions of titles I and III of this legislation."); see also *Alumni Cruises, LLC v. Carnival Corp.*, 2013 WL 6511737, *10, -- F.Supp.2d -- (S.D. Fla. 2013) ("Although not appropriate for all issues arising under the ADA, courts regularly find analogous and therefore apply case law addressing one title of the ADA to cases involving another.").

The Title III of the ADA defines "discrimination" as a failure to remove architectural barriers where it is readily achievable to do so. 42 U.S.C. § 12182(b)(2)(A)(iv). The term "barrier" is not defined in the Act itself but is defined in the Technical Assistance Manual:

> III-4.4100: What is an architectural barrier? Architectural barriers are physical elements of a facility that impede access by people with disabilities. These barriers include more than obvious impediments such as steps and curbs that prevent access by people who use wheelchairs.

Department of Justice, Technical Assistance Manual on the American with Disabilities Act (BNA) §§ III-4.4100 (1991). Case law is more specific. "To determine if Plaintiff describes an 'architectural barrier' the Court must turn to the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"). If an element does not meet or exceed ADAAG standards, it is considered a barrier to access." *Rush v. Denco Enterprises, Inc.*, 857 F. Supp. 2d 969, 973 (C.D. Cal. 2012) (internal cites omitted). "Any element in facility that does not meet or exceed the requirements set forth in the ADAAG is a barrier to access." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (identifying this as the formal position of the Department of Justice). These are "objective" and "precise" standards and "the difference between compliance and noncompliance" is "often a matter of inches." *Id.*

The 1991 Standards are found at 28 C.F.R., Part 36, Appendix "D" and the 2010 Standards are found at 36 C.F.R., Part 1191, Appendices "B" and "D." The correct title of the 1991 Standards is "1991 Standards for Accessible Design." However, in the earliest published decisions, courts and practitioners mistakenly referred to these Standards as the Americans with Disabilities Act Accessibility Guidelines (ADAAG), perhaps not understanding that the ADAAG promulgated by the Access Board were not the enforceable Standards but merely guidelines or recommendations made to the Department of Justice. When the DOJ adopted them, they were renamed as Standards in the Federal Register. But the original name stuck.

The ADAAG was updated in 2010, resulting in the 2010 Americans with Disabilities Act Standards ("ADAS"). The Plaintiff recognizes that, technically, either the 1991 Standards or the 2010 Standards govern in this case, but not both simultaneously. However, both Standards are cited to demonstrate that it does not matter which Standard is applied because most, if not all, of the violations cited do not comply with either standard.

In the present case, there were numerous "barriers" to full and equal access throughout the KMC facility.

### 1.   Patient Rooms

ADAAG 4.13.6 requires a minimum clear space adjacent to doors of 18" to the strike side on the pull side of the door. ADAAG 4.19.2 requires that sinks and lavatories be provided with a 27" high by 30" wide by 8" deep knee space. ADAAG 4.19.4 requires that lavatory and sink pipes be wrapped or insulated to prevent injury. ADAAG 4.27.4 requires that lavatory controls be operable by one hand. Since foot

12

controls are not usable by a wheelchair user, this type of control does not comply. ADAAG 4.19.6 requires that the bottom of the reflective surface of mirrors be no higher than 40" above the floor so wheelchair users can see their reflection. ADAS 604.3.1 requires a minimum 60" clear width at accessible toilets. ADAAG 4.13.5 requires that doors along an accessible route provide a minimum clear width opening of 32 inches when the door is open 90 degrees. ADAAG 4.17.6 requires a minimum 36" long grab bar be provided on the rear wall and a minimum 42" long grab bar be provided on the side wall adjacent to accessible toilets.

None of these simple clear requirements, most of which have been in place for over 20 years, were met by Defendant's patient rooms. The strike side clearance was a foot short. The foot-pedal operated sinks were unusable without risk of injury to wheelchair users. The restroom door was too narrow, and the grab bars were nonexistent. Mr. Gray encountered these conditions both in October 2011 and in July 2014 and was excluded from full use of the amenities of his room by reason of his disability.

## 2.    *Public Restrooms*

The standards violated by Defendant's public restrooms are numerous. In addition to some of the standards enumerated above, the public restrooms violated the following. Per ADAAG 4.18.2, an accessible urinal with a maximum rim height of 17" is required. ADAAG 4.16.2 required that the centerline of toilets be exactly 18" from the adjacent wall and ADAS 604.2 requires the centerline to be 17" – 18" from the adjacent wall, so the toilet location does not comply with either standard. ADAAG 4.2.6 only allows a maximum height of 54" and ADAS 309.3 only allows a maximum height of 48" for items such as soap

13

dispensers.  ADAAG 4.22.7 also requires that all dispensers in toilet rooms be located on an accessible route and ADAS 309.2 requires that operable parts shall be located adjacent to a clear floor space, which is not the case when the dispenser is mounted above an obstruction such as a toilet. ADAAG 4.16.3 requires that accessible toilets have a seat height between 17" – 19" above the floor. ADAAG 4.3.7 requires that the cross slope along accessible route shall not exceed 2.0%. ADAAG 4.19.5 requires that lavatory faucets be of a type that does not require grasping, such as push-type or lever-style. ADAAG 4.22.3 requires that accessible toilet rooms be provided with a 60" diameter turning space to allow a wheelchair user to enter the room, turn around and exit the room.

Here, urinals were too high, toilet locations were misplaced, and mirrors and soap dispensers were too high throughout the facility. So-called accessible toilet compartments were nearly two feet too small, and the slope in the "accessible" compartment was nearly twice what it should be. Like in the patient rooms, the public restrooms lacked grab bars and insulation on hot water pipes, creating hazardous conditions for wheelchair users. Mr. Gray encountered these violations countless times both as a patient at the hospital and as a visitor for admitted patients. He was wholly excluded from many of the restrooms at KMC due the extent of the non-compliance. He was discriminated against because he was forced to travel greater distances than visitors who are not wheelchair users.

### 3.    *Ramp and Exterior Path Slopes*

Many of Defendant's ramps and exterior pathways fail to comply with the applicable standards. ADAAG 4.8.2 and ADAS 405.2 only allows a maximum 8.33% slope at ramps.  Since the slope of the ramps

14

leading to the West Lobby and Patient Financial Office have slopes exceeding the maximum allowed, they fail to comply with ADAAG or ADAS. ADAAG 4.8.5 requires that ramps with a overall rise exceeding 6" or a horizontal run exceeding 6 feet, handrails shall be provided on both sides. ADAAG 4.8.5(5) requires that ramp handrails be mounted between 34" – 38" above the ramp surface. ADAAG 4.8.7 requires that ramps with drop-offs be provided with curbs, walls, railings or projecting edges that prevent people from slipping off the ramp.

As for exteriors paths of travel, ADAAG 4.3.7 requires that the cross slope along an accessible route not exceed 2.0%. ADAAG 4.7.2 requires that curb ramps have a slope not exceeding 8.33% (1:12) and that the counterslope of adjacent gutters and landings not exceed 5.0% (1:20). ADAAG 4.1.2(2) requires that at least one accessible route connect all accessible buildings and spaces within a site. ADAS 206.2.4 further refines this requirement by stating that "at least one accessible route shall connect...facility entrances with all...elements...within the...facility which are otherwise connected by a circulation path."

Here, numerous ramps and paths of travel were simply too steep, and many of the same areas lacks adequate handrails, once again creating hazardous conditions for Plaintiff and all wheelchair users.

### 4.      *Neo-natal Intensive Care Unit*

As noted above, the standards require a minimum clear space adjacent to doors of 18" to the strike side on the pull side of the door. They require sinks that can be operated with one hand and include eight inches of knee space, with hot water pipes that are insulated to avoid burns. All of these requirements were violated in Defendant's NICU. Mr. Gray encountered all of the violations when his grandson was admitted,

15

making what would be a difficult time for any parent and grandparent even more challenging because Mr. Gray relies on a wheelchair.

### 5.    *Drinking Fountains*

Where a public entity offers drinking fountains, two must be offered. ADAAG 4.1.3(10)(a) requires that each floor shall have 2 drinking fountains; one for wheelchair users and one for individuals who have difficulty bending or stooping.  ADAAG 4.15.2 requires that drinking fountains for wheelchair users shall have a spout that is no higher than 36" above the floor. ADAAG 4.15.5(1) requires that wheelchair-accessible drinking fountains provide a minimum 30" wide x 27" high x 17" deep knee space.

Here the fountains were too high for Mr. Gray to use and one lacked knee clearance. When he asked for a cup to accommodate this, he was told none were available. Where ambulatory individuals could make easy use of the fountains, Mr. Gray was forced fashion a cup out of a piece of paper.

### 6.    *Undue Burden*

Under 28 C.F.R. § 35.164, a public entity is not required to take any action "it can demonstrate would result ... in undue financial and administrative burdens." In those circumstances, "a public entity has the burden of proving that compliance with this subpart would result in such ...burdens." Id. Further, "[t]he decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

1   accompanied by a written statement of the reasons for reaching that

2   conclusion." Id.

3       Here, Plaintiff anticipates Defendant will raise an Undue Burden

4   defense. However, Defendant has wholly failed to complete the inquiry

5   necessary to form the form basis of this defense. A cursory inspection was

6   only very recently completed by numerous unnamed individuals of

7   dubious qualifications. It did not include large segments of KMC, nor did

8   it include any sort of economic analysis. Finally, the inspection did not

9   result in a written determination that any of the enumerated violations

10  present an undue burden to remedy.

11      In sum, there has been a violation of the American with Disabilities

12  Act.

13

14  **V.   VIOLATION OF THE CALIFORNIA DISABLED PERSONS**

15  **ACT ("CDPA")**

16      The CDPA provides that "A violation of the right of an individual

17  under the Americans with Disabilities Act of 1990 (Public Law 101-336)

18  also constitutes a violation of this section." Civ. Code § 54 (c).  "A

19  violation of the ADA is, by statutory definition, a violation of both the

20  Unruh Act and the DPA." *Cullen v. Netflix, Inc.*, 880 F.Supp.2d 1017,

21  1023 (N.D. Cal. 2012). As discussed above under section "IV", the

22  defendants violated the ADA. Thus, there has been a per-se violation of

23  the CDPA.

24  ///

25  ///

26  ///

27  ///

28

---

17

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

## VI.   REMEDIES

Under Title II of the ADA, a plaintiff is entitled to injunctive relief and compensatory damages and his attorney fees. (*Lovell v. Chandler* (9th Cir. 2002) 303 F.3d 1039, 1056). Under the Disabled Persons Act, a plaintiff is entitled to two types of damages: (1) actual damages and (2) a penalty assessment for each and every offense. (Civ. Code § 54.3(a).) "The statute lists actual damages and statutory damages as two separate categories of damages that a plaintiff may recover."

However, Plaintiff has elected to reserve this question for trial, and is not seeking a ruling on injunctive relief or damages at this time.

## VII.   CONCLUSION

The Plaintiff respectfully requests this Court make a determination that Defendant has violated his rights under the Americans with Disabilities Act and the California Disabled Person Act.


Dated: August 25, 2015          CENTER FOR DISABILITY ACCESS


By:____/s/ Christina Sosa_____
Christina Sosa, Esq.
Attorneys for Plaintiff

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT