CENTER FOR DISABILITY ACCESS
Mark Potter, Esq., SBN 166317
Phyl Grace, Esq. SBN 171771
Sara Gunderson, Esq. SBN 302582
Mail: PO Box 262490
San Diego, CA 92196-2490
Delivery: 9845 Erma Road, Suite 300
San Diego, CA 92131
(858) 375-7385; (888) 422-5191 fax
sarag@ potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Arthur Gray**, <br><br> Plaintiff, <br><br> v. <br><br> **County of Kern**, <br><br> Defendant. | **Case:** 1:14-CV-00204-LJO- JLT <br><br> **Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment as to Liability and Injunctive Relief Only** <br><br> Date:   May 28, 2018 <br> Time:   8:30 am <br> Ctrm:   4 (7th floor) <br><br> Hon. Judge Lawrence J. O'Neill |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ........................ 1

I.   PRELIMINARY STATEMENT ...................................................... 1

II.  RELEVANT FACTS ................................................................ 2

III.   LEGAL STANDARD.................................................................. 6

IV.   ARGUMENT ........................................................................ 6

1)   **California's Disabled Person's Act** ....................................... 17

V.  RIGHT TO INJUNCTIVE RELIEF ............................................. 17

VI.   CONCLUSION.......................................................................... 17

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1067 (9th Cir. 2010) ..... 8

*Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)….8

*Midgett v. Tri-County Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001)…..17

*Rush v. Denco Enterprises, Inc.*,

    857 F. Supp. 2d 969 (C.D. Cal. 2012) ................................................ 11

Title 28, Part 35 of the Code of Federal Regulations .............................. 8

**Statutes**

42 U.S.C. § 12131(1)(B)…………………………………………..7

42 U.S.C. § 12131(2) 28 C.F.R. §35.104…………………………8

29 U.S.C. § 794(a)……………………………………………16

Cal. Civ. Code § 54(a)…………………………………………..16

**Other Authorities**

28 C.F.R. § 36.304(b) ................................................................................. 9

28 C.F.R., Part 36, Appendix D

    ("ADAAG") § 4.27 ............................................................................. 7

Department of Justice, Technical Assistance Manual on the American with

    Disabilities Act (BNA) §§ III-4.4100 (1991) ...................................... 6

ii

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  PRELIMINARY STATEMENT

Plaintiff Arthur Gray ("Mr. Grey" or "Plaintiff") is an individual with paraplegia who uses a wheelchair for mobility.  Mr. Grey brought this action in February 2014 to challenge accessibility barriers he encountered at Kern Medical Center (Medical Center); barriers he contends violate Title II of the American's with Disabilities Act ("ADA"), 42 U.S.C. §12131 et seq., Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794 et seq., and California's Disabled Persons Act ("CDPA"), Cal. Civ. Code § 54 et seq.

After years of litigation, the only barriers remaining at issue in this matter are the slopes on the ramps leading into and out of the Medical Center building. There are three such ramps: (1) the ramp leading to the hospital's west entrance; (2) the ramp leading to the patient financial office; and (3) the ramp leading to the emergency room. It is Plaintiff's contention that these ramps present excessive slopes that violate federal accessibility standards. Plaintiff has actual knowledge and experience with these barriers, which have caused him significant difficulty, discomfort, frustration, inconvenience and embarrassment. Mr. Gray has been deterred from visiting the Medical Center over the last few years due to his knowledge of the barriers, for both his own medical treatment and to visit hospitalized loved ones.

Via the instant Motion, Mr. Gray seeks a finding from the court that the Medical Center violated his rights under the ADA, Section 504 and the CDPA, and a related order for injunctive relief. Plaintiff specifically reserves the issue of damages for trial.

1

## II.  RELEVANT FACTS

### A. Parties

Plaintiff Arthur Gray is paraplegic. He cannot stand or walk and has significant manual dexterity impairments. (SUF #1).  Mr. Gray is and at all times relevant herein was, a "qualified person with a disability" and a "physically disabled person" as those terms are defined under the ADA and its implementing regulations. (SUF #2). Mr. Gray uses a wheelchair for mobility. (SUF #3).

Defendant County of Kern ("County" or "Defendant") is, and at all times relevant to herein was, a local government and public entity. (SUF #4). The County owned, operated, controlled, maintained and exercised dominion over Medical Center located in or about 1700 Mount Vernon Avenue in the City of Bakersfield, County of Kern, California until July 1, 2016, when its control was passed to the Kern County Hospital Authority. (SUF #5 & 6). The County is still involved in the Medical Center's operations, however, as it contracts with the Medical Center to provide health care services to medically indigent adults as required by state law and retains ultimate responsibility for such care pursuant to Section 17000 of the Welfare and Institutions Code.  (SUF #7).

### B. The Medical Center

The Medical Center is a 222 bed acute care teaching hospital. (SUF #8).  Through the Medical Center the County provides medical services to indigent patients.  (SUF #9).   The Medical Center is a recipient of federal financial assistance through Medi-Cal/Medicaid and Medicare payments. (SUF # 10).

2

At all times relevant to this action, Defendants were a "public entity" within the meaning of Title II of the ADA, and the public facilities at the Medical Center are a program, service and/or activity Defendants offer to the general public. (SUF #11). The Medical Center has undergone construction and/or alterations since January 26, 1992. (SUF #12), and as recently as 2015 (SUF # 13.) Many constructions project have been undertaken, including in mammography and CT imagine among many others. (SUF #14)  And while dozens of construction projects have been undertaken in the past 25 years, none of them addressed the slope of the west entrance ramp. Id. KMC had knowledge in 1995 that the slope of the ramp leading to the west entrance was too steep, as evidenced by the handwritten note on the medical center's building plans: "Too steep, too long." (SUF #15). Kern Medical Center has known that the slope of its west entrance ramp was too steep for at least twenty-three years.

### C. Plaintiff's Experiences at the Medical Center

Mr. Gray has been a patient at the Medical Center for decades. (SUF #16). He has visited the Medical Center a number of times annually to obtain emergency room services, primary care, orthopedic care, surgery, x-rays and other medical services. (SUF #17). The Medical Center is the designated location where Mr. Grey must go to service the computerized medical equipment in his abdomen when it malfunctions. (SUF #18).  Relevant to the instant litigation, Mr. Gray visited the Medical Center numerous times in September 2011 when his grandson was admitted shortly after birth. Mr. Gray's grandson stayed in the Neo-natal Intensive Care Unit ("NICU") for several days. (SUF #19).

3

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

1  Additionally, on October 3, 2011 Mr. Gray broke his femur and was
2  admitted to the Medical Center. He had surgery and stayed in the
3  hospital in a patient room for numerous days. (SUF #20).

4  Also relevant to the instant litigation, Mr. Gray visited multiple
5  areas of the Medical Center on numerous occasions between the end of
6  2011 through 2013, both as a patient and as a visitor. These visits
7  included follow-up doctor visits for his femur surgery as a patient,
8  emergency room visits as a patient, and visits to friends and family who
9  were admitted patients. (SUF #21). Between October 2011 and August
10 2014, Mr. Gray was deterred from visiting the Medical Center on
11 approximately fifty (50) occasions due in part to the conditions
12 described below. (SUF #22). Approximately twenty (20) of those visits
13 were times Mr. Gray requested the ambulance he had called divert away
14 from the Medical Center. (SUF #23).

15 On the above-mentioned occasions, and on other dates over the
16 years, Mr. Gray personally encountered excessive slopes on the west
17 entrance ramp to the Medical Center. The steep slopes made the ramp
18 unsafe for Mr. Grey to use. (SUF #26).These excessive slopes caused
19 Mr. Grey to experience difficulty, discomfort, frustration, inconvenience
20 and embarrassment. (SUF #27) Mr. Grey was forced to bring other
21 people with him to assist him in using the ramp or to seek assistance
22 from strangers to push him up of the ramp and into the Medical Center.
23 (SUF #24).

24 Mr. Gray complained to the employees to the Medical Center
25 regarding the frustrations, problems, and dangers he has faced while
26 using the west entrance ramp on numerous occasions. (SUF #25).

27 **D. Plaintiff's Expert Findings Regarding the Slopes of the**

28

4

**Ramps Leading to the Medical Center.**

- Plaintiff's expert, Paul Bishop, inspected the Medical Center on June 29, 2014 and April 4, 2018, and has drafted both an expert report and a rebuttal report for this matter. (SUF #28). In conducting his site inspection, Mr. Bishop utilized a standard construction tape measure, door pressure gauge and SmartTool digital level. The digital level was calibrated per manufacturer's instructions immediately before Mr. Bishop conducted the physical portions of the site inspection. (SUF #29).

Mr. Bishop's findings include the following:

1) The running slope of the ramp leading to the Medical Center's patient financial office measures 9.0%, exceeding applicable ADA accessibility standards; (SUF #34).

2) The running slope of the ramp leading down to the Medical Center's emergency room measures 5.5%, too steep for a ramp without handrails under applicable accessibility regulations (SUF #30);

3) The running slope of the west entrance ramp measures 9.6%, exceeding applicable accessibility standards (SUF #33);

4) Spot measurements on the west entrance ramp revealed slopes exceeding the 8.33% maximum allowed by applicable ADA accessibility standards in numerous locations. (SUF #31);

5) Spot measurements on the west entrance ramp measured as high as 10.5%, representing more than a twenty-five

5

percent increase over the maximum slope allowed by applicable ADA accessibility standards (SUF #31-32);

Because Mr. Gray is a regular patient at the Kern Medical Center, he will continue to face the same discriminatory barriers at the Medical Center unless and until they are remediated. (SUF #35).

### III.  LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

In the present case, there is no genuine issue of material fact regarding the excessive slopes presented by the ramps leading into and out of the Medical Center. Accordingly, this court should grant the Plaintiff's Motion for summary judgment as to liability.

### IV.  ARGUMENT

### A. There is No Genuine Issue of Material Fact regarding Defendant's Liability for Plaintiff's ADA Claim

6

To make out a prima facie case under Title II of the ADA, a plaintiff must show that: "(1) [he] is an individual with a disability; (2) [he] is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) [he] was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of [his] disability."[1]

### a. Plaintiff is an Individual with a Disability.

Under the ADA, disability is defined as a "physical or mental impairment that substantially limits one or more major life activities."[2] "Major life activities" include "walking" and "standing".[3] As the undisputed facts cited above establish, Plaintiff has paraplegia and cannot stand or walk. There is therefore no genuine issue of material fact as to Plaintiff's status as an individual with a disability as defined by the ADA.

### b. The County is a Public Entity Subject to Title II of the ADA

Under the ADA the term "public entity" is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). It is undisputed that the County is a public entity. The County is a local governmental entity and political subdivision of the State of California. Defendant admitted in its Answer that it is a public entity with the

---

[1] Sheehan v. City & Cnty. of S.F., 743 F.3d 1211, 1232 (9th Cir. 2014).
[2] 42 U.S.C. § 12102(1)(A).
[3] 42 U.S.C. § 12102(2)(A).

7

meaning of Title II of the ADA; its status as such does not present a genuine issue of material fact.

### c. The Provision of Medical Services through the Medical Center is a Service, Program or Activity of the County.

There is no genuine dispute of material fact that the Medical Center is a service, program or activity of the County. Providing public health programs and medical services to indigent persons is something the County does, is a normal function of a governmental entity, and meets a public need. See *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)("the ADA's broad language brings within its scope "anything a public entity does").

It is undisputed that the County directly owned and operated the Medical Center until July 1, 2016, and that after July 1, 2016 it contracted with the Hospital Authority to continue the provision of medical services to the County' indigent. The fact that the County's services were contracted as of July 1, 2016, does not absolve the County of liability or obviate the need for or appropriateness of injunctive relief, as it is well established that public entities cannot contract away their obligations under Title II of the ADA.  See 28 C.F.R. § 35.130(b)(1); *Armstrong v. Schwarzenegger* 622 F.3d 1058, 1062, 1067 (9th Cir. 2010)(holding that ADA regulations explicitly prohibit public entities from avoiding Title II obligations through contractual relationships.).

### d. Plaintiff is Qualified.

Under the ADA a "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131(2) 28 C.F.R. §35.104. Plaintiff meets this definition. Plaintiff is a member of the public who meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the County at the Medical Center. It is undisputed that Plaintiff has participated in and received the benefits of the health programs and medical services offered at the Medical Center as a patient and visitor for decades. There is therefore no genuine issue of material fact that Plaintiff is a qualified individual with a disability.

### e. Defendant discriminated against Plaintiff based on Disability.

Plaintiff can prove Defendant's liability in two distinct ways: (1) the City's failure to comply with new construction and alteration requirements; and (2) the City's failure to provide programmatic access.

i. Failure to comply with new construction / alteration requirements.

Under Title II of the ADA the County is required to design, construct and/or alter its facilities in a manner such that they are readily accessible to and usable by individuals with disabilities, when the construction/alteration was commenced after January 26, 1992. 28 C.F.R. § 35.151(a) and (b). Section 35.151 also requires that newly constructed or altered facilities meet the technical standards set forth in

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

1   the 1991 Standards for Accessible Design ("ADAAG")[4], or the 2010

2   Standards for Accessible Design ("ADAS")[5]. See id. § 35.151(c).

3        The ADAAG required that the maximum slope of ramps be no

4   more than 1:12 (8.33%).[6] The ADAS, published September 15, 2010 and

5   effective March 15, 2012 imposes a similar requirement, providing that

6   the maximum slope of ramps be no more than 1:12 (8.33%).[7]

7        Documents provided by the County show that the Medical Center

8   underwent construction and/or alteration after 1992 and again after 1995.

9   These documents also show that the west entrance ramp was identified

10  as being "too steep, too long" and was an intended subject of these ADA

11  renovations (SUF #15). However, alterations to the west entrance ramp

12  failed to comply with the standard that would have been applicable at the

13  time – whether the 1991 ADAAG or the 2010 ADAS. As Plaintiff's

14  expert Paul Bishop has established, the running slope of the west

15  entrance ramp measure 9.6%, well above the maximum of 8.33% set by

16  ADAAG and ADAS. Additionally, a majority of spot measurements

17  taken at various points along the ramp exceed applicable standards,

18  presenting slopes exceeding the maximum allowable percentage of

19  8.33% by as much as +2.2%. This non-compliance is significant. Slopes

20  measuring as high as 10.5%, represent a more than a twenty-five percent

21  increase over the maximum allowed by applicable standards.[8]

22

23  _____

24  [4] 1991 ADA Accessibility Guidelines, 28 C.F.R., Part 36, Appendix "D"

25  [5] 2010 ADA Standards for Accessible Design, 36 C.F.R., Part 1191,

26  Appendices "B" and "D".

    [6] ADAAG, at Section 4.8.2. See Exhibit 14.

27  [7]ADAS, at Section 405.2. See Exhibit 15.

28  [8] See ADAAG 4.8.2. and ADAS 405.2. See also, Exhibit 16.

10

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

Given the above, there is no genuine issue of material fact as to Defendant's failure to comply with the ADA's standards for new construction and alterations.

### f.  Failure to Provide Programmatic Access

Under Title II of the ADA, public entities must ensure that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This is commonly referred to as the ADA's "program access" requirement.

Even if the ramps leading into the Medical Center are not subject to the new construction and alteration requirements, Defendant would still be liable to Plaintiff under the ADA for its failure to provide "program access" to the Medical Center. The County has failed to take the steps necessary to ensure that the ramps leading into the Medical Center are accessible to people with disabilities who use wheelchairs, including Plaintiff.

An individual is excluded from participation in or denied the benefits of a public program if "a public entity's facilities are inaccessible to or unusable by individuals with disabilities."[9] As the Ninth Circuit has noted, "[o]ne form of prohibited discrimination is the exclusion from a public entity's services, programs or activities because of the inaccessibility of the entity's facility."[10]

In the instant case, there is no genuine issue of material fact that all three of the ramps leading in and out of the Medical Center present

---

[9] 28 C.F.R. § 35.149.

[10] Barden v. City of Sacramento, 292 F.3d 1073, 1075 (9th Cir. 2002).

11

slopes that exceed accessibility standards. This is a clear violation of the ADA's program access mandate. Plaintiff's expert, Paul Bishop has submitted expert and rebuttal reports detailing how the three ramps at issue at the Medical Center fail to comply with ADA standards. The inaccessible conditions are cited above, detailed in Exhibits 7 and 10 to the declaration of Paul Bishop, and summarized below.

> i. Ramps to the patient financial office and emergency room.

In his expert report, Mr. Bishop identifies the slope to the patient financial office to have a running slope of 9.0%.  This exceeds the maximum allowable slope of 8.33% under both the ADAAG and ADAS. Defendant's expert report presented no evidence to dispute this finding.

Mr. Bishop identifies the running slope of the ramp leading down to the emergency room to measure 5.5%. However, this is too steep for a ramp without handrails. Ramps with an overall rise exceeding six inches, and a horizontal run exceeding six feet are required to have handrails.[11] Defendant's expert report presented no evidence to dispute this finding.

> ii. Ramp to the west entrance.

With regard to the west entrance ramp, Mr. Bishop has set forth compelling and conclusive evidence of its inaccessibility, and explains the inadequacy of the defense expert's measurements concluding otherwise. As noted above, the ramp presents a running slope of 9.6%, well above the maximum of 8.33% set by ADAAG and ADAS. Additionally, a majority of spot measurements taken at various points along the ramp exceed applicable standards, presenting slopes exceeding the maximum allowable percentage of 8.33% by as much as +2.2%.

---

[11] See ADAAG 4.8.5 and ADAS 405.8. See Exhibit 17.

Plaintiff's Motion for Summary Judgment           Case: 1:14-CV-00204-LJO- JLT

Defendant's expert, Michael Gibbens, puts forth different findings regarding the west entrance ramp in his expert report[12], but both his calculations and arguments are incorrect. As an initial matter, Mr. Gibbens erroneously fails to address or consider the flatness of the ramp slope. (See Exhibit 7 to Bishop Decl. at pp. 4-6.) This fact, in conjunction with the discrepancies in slope measurements taken by Mr. Gibbons and Mr. Bishop leads to the conclusion that the west entrance ramp has a wavy profile with local variations exceeding maximum slope standards that would be difficult for a person using a wheelchair to navigate.  Id. at pp. 5-6.

Mr. Gibbens also cursorily references the concepts of "equivalent facilitation" and "tolerances" in an effort to justify the excessive slopes of the west entrance ramp.[13]  These concepts do not help the Defendant avoid liability here. First, with regard to equivalent facilitation, Mr. Gibbens does not provide any guidance, citations or authority to support his apparent position that slopes exceeding maximum standards by up to +2.2% constitute "equivalent facilitation." Equivalent facilitation permits "[d]epartures from particular technical and scoping requirements of [1991 ADA accessibility guidlines] by the use of other designs and technologies [] where the *alternative designs and technologies used will provide substantially equivalent or greater access to and usability of the facility*."  ADAAG Section 2.2 (emphasis added). See also ADAS 103 ("Nothing in these requirements prevents the use of designs, products, or technologies as alternatives to those prescribed, provided they result in substantially equivalent or greater accessibility and usability.") It is

---

[12] Exh.11 to Gunderson Decl. at pgs. 5-6

[13] Id.

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

absurd to think that the excessive slopes present in this case provide "substantially equivalent or greater accessibility and usability" than slopes that comply with applicable standards. Moreover, the concept of equivalent facilitation was intended to provide flexibility to use *alternative* designs and technologies; that is simply not the situation here. With regard to tolerances, Mr. Gibbens' assertions are similarly inapposite. Gibbens again provides no guidance, citations or authority regarding the "conventional industry tolerances" he summarily asserts relieves the County from liability, suggesting he is of the opinion that there is no upper limit for allowable ramp slopes.[14]

Mr. Bishop cites to *Dimensional Tolerances in Construction and for Surface Accessibility*, a report prepared by David Kent Ballast, Architectural Research Consulting under contract with the Access Board's research program (hereinafter "Report"), for guidance on appropriate slope tolerances for ramps.[15] The Report provides for a recommended ramp slope tolerance of +0.5%.[16] The Report also provides that when there are local variations (flatness) in the running slope of a ramp at least 80% of the measurements should not exceed an 8.3% slope. The remaining measurements should not exceed a 10% slope.[17]

---

[14] Exh. 11 to Gunderson Decl. at p.5-6; Exh. 7 to Bishop Decl., at p. 7.

[15] Exh. 7 to Bishop Decl., at pp. 7-8.

[16] Dimensional Tolerances in Construction and for Surface Accessibility, Final Report January 2011, prepared by David Kent Ballast, Architectural Research Consulting, available at: https://www.access-board.gov/research/completed-research/dimensional-tolerances, at Section 1.2.5.

[17] Dimensional Tolerances in Construction and for Surface Accessibility, Final Report January 2011, prepared by David Kent Ballast, Architectural Research

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT

Using the slope tolerance recommendation in the Report, Mr. Bishop opines that a maximum allowable ramp slope for the west entrance ramp is 8.83%.[18] The ramp fails to comply with this allowable construction tolerance, presenting a running slope of 9.6%. The ramp also fails to comply with the local variation tolerances in the Report. Utilizing the multiple measures taken by Mr. Bishop along the north and south sides of the west entrance ramp, only 59% of the slopes on the north side and 29% of the slopes on the south side measures less than 8.33%, falling considerably short of the 80% set forth in the Report.[19]

### g. Defendant's non-compliance with its obligations is ongoing and continuous.

Title II of the ADA required public entities including the County to remove physical barriers that limit or deny access to its programs, services and activities under Title II of the ADA by no later than January 26, 1995.[20]   Therefore, by no later than January 26, 1995, the County was required to complete the structural changes necessary to make the Medical Center accessible to persons with disabilities to comply with the ADA, yet wholly failed to do so. Moreover, the County failed to comply with its ADA obligations in the over 20 years it controlled the Medical Center after January 26, 1995. In light of its ongoing program access

Consulting, available at: https://www.access-board.gov/research/completed-research/dimensional-tolerances, at Section 1.2.6.

[18] Exh. 7 to Bishop Decl., at p. 8.

[19] Exh. 7 to Bishop Decl., at p. 8.

[20] See e.g., Pierce v. County of Orange, 526 F.3d 1190, 1216 (9th Cir. 2008); 28 C.F.R. § 35.150(c)("Where structural changes in facilities are undertaken to comply with the obligations established under this section, such changes shall be made within three years of January 26, 1992, but in any event as expeditiously as possible.")

15

obligations, to avoid liability in this case the County will be required to show that it has been unable to fund the necessary work to remedy the inaccessibility of the ramps at the Medical Center during the twenty-six year period since Title II of the ADA became effective on January 26, 1992. It will be unable to do so. The ongoing and continuing nature of the Defendant's non-compliance also supports Plaintiff's claim for injunctive relief.

## B. There is No Genuine Issue of Material Fact regarding Defendant's Liability for Plaintiff's Section 504 Claim

As a recipient of federal financial assistance, the County is subject to Section 504 of the Rehabilitation Act.  Section 504 provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).

Substantively, liability under Section 504 and liability under the ADA are analyzed similarly[21]; accordingly, Section 504 will not be discussed separately herein.

---

[21] _Pierce v. County of Orange_, 526 F.3d 1190, 1216 n.27 (9th Cir. 2008) (Title II of the ADA was modeled after Section 504; "'[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act'" (quoting Zukle v. Regents of Univ. of California, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999))); Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997) (noting that "Congress has directed that the ADA and RA be construed consistently" (citing 42 U.S.C. § 12134(b))).

16

### 1) **California's Disabled Person's Act**

The CDPA provides that "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places." Cal. Civ. Code § 54(a). A violation of the ADA is a violation of the CDPA[22]; accordingly, CDPA will not be discussed separately herein.

## V.  RIGHT TO INJUNCTIVE RELIEF

Title II of the ADA and Section 504 both provide for injunctive relief.[23] For injunctive relief, a plaintiff "must present facts showing a threat of immediate, irreparable harm before a federal court will intervene." *Midgett v. Tri-County Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001).  That burden is met in the instant case. Defendant County refuses to remediate the ramps at issue, insisting they do not violate the law an necessitating this litigation.  Plaintiff continues to seek and require care at the Medical Center, as he has for decades. Without an order of injunctive relief, Plaintiff will continue to be denied full and equal access to the Medical Center, and will be prevented and deterred from obtaining medical treatment there.

## VI.  CONCLUSION

The Plaintiff respectfully requests this Court make a determination that Defendant has violated his rights under the Americans with Disabilities Act, Section 504 and the CDPA, and order that the three

---

[22] Cal. Civ. Code, §§ 54(c)

[23] 42 U.S.C. §§ 12133; 29 U.S.C. § 794a.

Plaintiff's Motion for Summary Judgment                    Case: 1:14-CV-00204-LJO- JLT

1  ramps leading into the Medical Center be remediated to comply with
2  ADA accessibility standards
3
4  Dated: April 30, 2018          CENTER FOR DISABILITY ACCESS
5
                                  By: /s/ *Sara N. Gunderson*
6                                 Sara Gunderson, Esq.
                                  Attorneys for Plaintiff
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff's Motion for Summary Judgment          Case: 1:14-CV-00204-LJO- JLT